*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-598

GEORGE C. PAPAGEORGE, APPELLANT,

v.

BOYLE STUCKEY, *et al*., APPELLEES.

FILED 11/15/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-2336-13)

(Hon. Michael L. Rankin, Trial Judge)

(Argued September 27, 2018                    Decided November 15, 2018)

*Kimberly K. Fahrenholz*, with whom *Patrick C. Horrell* and *Emily Whelden* were on the brief, for appellant.

*Kathryn Erklauer*, with whom *Carol S. Blumenthal* was on the brief, for appellees Boyle and Afomia Stuckey.

*Kevin M. Murphy*, with whom *Joseph A. Smith* was on the brief, for appellee Eastern Savings Bank, FSB.

Before FISHER, EASTERLY, and MCLEESE, *Associate Judges*.

FISHER, *Associate Judge*:  In the latest chapter of a long-running property dispute, George Papageorge alleges that Boyle Stuckey and Afomia Stuckey ("the Stuckeys") and Eastern Savings Bank ("ESB") violated his rights under the Tenant

Opportunity to Purchase Act ("TOPA"), D.C. Code §§ 42–3404.02 to 42–3404.13 (2012 Repl.). Papageorge claims that a former tenant of the property, Matt Banks, validly assigned TOPA rights to him. The trial court granted summary judgment for ESB and the Stuckeys on two grounds. First, the court found that judicial estoppel precluded Papageorge from invoking TOPA rights derived from Banks after acknowledging that Banks had waived his TOPA rights in the settlement of previous litigation. In the alternative, the court found that Papageorge had no enforceable TOPA rights because ESB had purchased Banks's rights without notice of Papageorge's claim that those rights had been assigned to him. We affirm for the separate reason that no event had triggered the provisions of TOPA.

## I. Background

Litigation began more than a decade and a half ago regarding the property located at 2507 33rd Street, S.E. ("the Property"), a house that included rental units in the basement and on the second floor. A truncated history begins in April 2001, when ESB purchased the Property at foreclosure.[1] That October, tenant Matt

---

[1] For a more thorough description of the past litigation, *see E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 8–10 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).

Banks purportedly assigned his rights under TOPA to Papageorge, a relative of the house's former owner. This court soon after ruled in ESB's favor regarding the propriety of the foreclosure sale. *See E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953 (D.C. 2003); *Pappas v. E. Sav. Bank, FSB*, 911 A.2d 1230 (D.C. 2006). Subsequently, ESB attempted to evict Banks from his unit due to a lease violation, an effort this court blocked due to defective notice. *See Banks v. E. Sav. Bank*, 8 A.3d 1239 (D.C. 2010). The next week, on December 9, 2010, Banks and Papageorge signed a document confirming the purported assignment from 2001 and formalizing their agreement that Papageorge would finance Banks's continuing litigation with ESB in exchange for seventy-five percent of any award.

On January 23, 2012, Banks and his wife, Diane Banks, reached a settlement of pending disputes with ESB, relinquishing their claims to the Property in exchange for $100,000.[2] That agreement called for the Bankses to vacate the premises by 5 p.m. on the next day, January 24. Papageorge alleges that on January 24 he mailed a letter to ESB expressing his interest in buying the property and enclosing a copy of a new assignment of TOPA rights; ESB claims it first saw

---

[2] Papageorge sued the Bankses for a portion of the proceeds from their settlement with ESB; the trial court granted summary judgment for the Bankses, but this court reversed and remanded. *See Papageorge v. Banks*, 81 A.3d 311, 324 (D.C. 2013).

the letter during litigation, more than one year later. The Bankses did not vacate the premises until January 25 — when the couple signed the settlement agreement — and ESB signed the document on January 26.

More than nine months passed until, on or about October 30, ESB agreed to give a real estate broker the exclusive right to sell the property. The listing agreement provided for a reduced commission if Boyle Stuckey purchased the house. An attorney for ESB attested in an affidavit that the bank first began negotiations with the Stuckeys in November. On December 7, ESB filed with the District government a Vacant Building Response Form which stated that the bank was "actively seeking to sell" the building. Two weeks later, on December 21, 2012, ESB sold the Property to the Stuckeys.

## II. Analysis

"The question whether summary judgment was properly granted is one of law, and we review *de novo*." *Johnson v. District of Columbia*, 144 A.3d 1120, 1125 (D.C. 2016) (citation and internal quotation marks omitted). "Summary judgment is only appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Liu v. U.S. Bank*

*Nat'l Ass'n*, 179 A.3d 871, 876 (D.C. 2018) (citation and internal quotation marks omitted).

We also have noted:

> An appellate court has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest affirmance on any ground that finds support in the record, provided it proceeds cautiously so as to avoid denying the opposing party a fair opportunity to dispute the facts material to the new theory.

*Franco v. District of Columbia*, 3 A.3d 300, 307 (D.C. 2010) (quoting *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 559–60 (D.C. 2001)). In cases like this, where a party raised an alternative theory in the trial court and the parties debated the issue on appeal, upholding summary judgment on that ground is procedurally fair. *See Nat'l Ass'n of Postmasters of the U.S. v. Hyatt Regency Washington*, 894 A.2d 471, 474 (D.C. 2006); *see also In re J.R.*, 33 A.3d 397, 400 n.3 (D.C. 2011) (finding no procedural unfairness when party was given an opportunity to respond to the separate argument).

The trial court briefly considered, and rejected, appellees' contention that Papageorge never validly obtained TOPA rights from Banks.[3]  However, for the reasons described below, we hold that neither Banks nor Papageorge ever had such vested rights.  We see no procedural unfairness in this holding since all three parties extensively discussed the issue in the trial court proceedings.  The appellees briefed this issue to our court, and the appellant responded in his reply brief.  Additionally, ESB and Papageorge each discussed the issue at oral argument.  No material factual disputes exist regarding Papageorge's lack of vested TOPA rights, so summary judgment is proper.  Because we affirm on that ground, we need not review the trial court's alternative holdings.

## A. TOPA's Structure

In 1980 the Council of the District of Columbia enacted the Rental Housing Conversion and Sale Act ("Sale Act").  The statute has several overarching purposes, including "[t]o discourage the displacement of tenants through conversion or sale of rental property" and "to strengthen the bargaining position of tenants toward that end without unduly interfering with the rights of property

---

[3]  In not granting summary judgment on that rationale, the trial court cited *Papageorge v. Banks*, which had left open the question of whether a tenant could assign rights that would not vest until a future time. *See* 81 A.3d at 321–23.

owners to the due process of law." D.C. Code § 42-3401.02 (1). TOPA, which is one component of that statute, provides a framework for tenants to purchase their housing when the owner sells the property.

The key provision describes the fundamental obligation of the owner:

> Before an owner of a housing accommodation *may sell the accommodation*, or issue a notice of intent to recover possession, or notice to vacate, for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

*Id.* § 42-3404.02 (a) (emphasis added).[4] Notably, this provision requires action by the owner only before a *sale* of a housing accommodation (or notice of intent to recover possession or vacate) may occur.[5] The owner does not have a duty to give

---

[4] The Council of the District of Columbia slightly changed the wording of this subsection, but it did so after the events relevant here took place. *See* TOPA Bona Fide Offer of Sale Clarification Amendment Act of 2015, 2015 D.C. Sess. Law Serv. 21–63 (West).

[5] The statute defines "sale" as "the execution of any agreement pursuant to which the owner of the housing accommodation agrees to . . . [r]elinquish[] possession of the property" or take other actions not applicable here. D.C. Code § 42-3404.02 (b)(1).

tenants the opportunity to purchase simply because he or she plans to sell the property sometime in the future.

Indeed, the requirements of TOPA often are triggered because the owner already has agreed to sell the property to a third party. At that point an owner must furnish tenants with an offer of sale. *See id.* § 42-3404.03. An owner may also choose to initiate the process by extending an offer of sale to the tenants before receiving a third-party contract. *See, e.g.*, *van Leeuwen v. Blodnikar*, 144 A.3d 565, 566 (D.C. 2016). To begin, the owner must provide written copies of the offer of sale to every tenant as well as either the mayor or the Department of Housing and Community Development (DHCD).[6] *See* D.C. Code § 42-3404.03. The owner must also post a copy of the offer of sale in a common area if the building has multiple units. *See id.* Such an offer of sale must include "[t]he asking price and material terms of the sale." *Id.* § 42-3404.03 (1). Within seven days of a request, the owner must provide tenants with a copy of the third-party contract, if it exists, and the building's floor plan. *See id.* § 42-3404.03 (3) to (4).

---

[6] DHCD supplies owners with forms for both an "Offer of Sale With a Third[-]Party Contract" and an "Offer of Sale Without a Third[-]Party Contract." See Dep't of Hous. & Cmty. Dev., *Rental Conversion and Sale Forms*, https://dhcd.dc.gov/node/1186251 (last visited Nov. 1, 2018).

TOPA contains separate provisions related to single-family accommodations, accommodations with two-to-four units, and those with five or more units. *See id.* § 42-3404.09 to .11. In the case of a building like the Property, which contains three units, tenants have fifteen days after receiving an offer of sale to jointly provide a written statement of interest to the owner if they wish to do so. *See id.* § 42-3404.10 (1). If no group of tenants has done so, any individual tenant may provide such a statement within the subsequent seven days. *See id.* Once the owner receives that letter, the parties have a window of at least ninety days to negotiate a contract of sale. *See id.* § 42-3404.10 (2).

**B. Because the Statute Was Never Triggered,**

**Neither Banks Nor Papageorge Ever Had Vested TOPA Rights**

We conclude that Matt Banks never possessed TOPA rights which he could assign to Papageorge because he was not a tenant at a time when TOPA had been triggered.[7] To be sure, § 42-3404.06 allows a tenant to assign his or her TOPA rights to a third party. Moreover, when TOPA rights have been validly assigned, the assignee can "effectively bec[o]me" a tenant of the unit for purposes of

---

[7] The Sale Act defines a tenant as a person "entitled to the possession, occupancy or benefits of a rental unit within a housing accommodation." D.C. Code § 42-3401.03 (17).

applying the statute. *See Allman v. Snyder*, 888 A.2d 1161, 1167 (D.C. 2005) (quoting *Medrano v. Osterman*, 885 A.2d 310, 312 (D.C. 2005)). As in *Papageorge v. Banks*, 81 A.3d at 323, we will assume, without deciding, that a tenant may assign, or agree to assign, TOPA rights that he does not yet have but expects to acquire in the future. But such a transfer will only confer contingent TOPA rights on the assignee unless those rights have vested in the tenant.

Here, the Bankses vacated the Property on January 25, 2012. Matt Banks was no longer a "tenant" as he was no longer entitled to possession of the unit. ESB had not made an offer of sale to Banks, and it was not required to do so under TOPA because it had not yet entered into a third-party contract. ESB did not have a contract with the Stuckeys until late 2012, many months after the building had become vacant. By that date, Matt Banks was no longer a tenant, and he thus had no vested TOPA rights — nor had the purported assignment to Papageorge effectively transferred such rights.

Papageorge contends that Banks must have had TOPA rights in January 2012 because the January 25 settlement contains language about ESB's intent to sell and Banks's waiver of his TOPA rights. Papageorge also claims the October 2012 listing agreement and the December 2012 vacant building response triggered

TOPA. None of these arguments is persuasive. Even if these documents show that ESB *intended* to sell the Property eventually (or even soon), there was not yet a third-party contract on January 25, 2012, and thus no requirement for ESB to furnish an offer of sale.

As ESB explained at oral argument, the lengthy settlement agreement demonstrated ESB's intention to foreclose future litigation by having the Bankses waive myriad potential claims. By reciting that Mr. and Mrs. Banks were "waiving . . . all rights they may have had, may have or may have in the future pursuant to" TOPA, the document did not acknowledge the validity of the Bankses' claim to TOPA rights. Additionally, even assuming that a brokerage agreement or vacant building form could trigger TOPA in other circumstances, each was executed many months after the Bankses ended their tenancy.

Since Matt Banks never had vested TOPA rights to assign, the statute did not require ESB to provide an offer of sale to Papageorge, the purported assignee of Banks. By the time ESB would have been required to provide an offer of sale to the Property's tenants or their assignees — by mailing written copies to the tenants, posting a copy in the common space, and notifying the mayor or DHCD — there were no current tenants or others with vested rights. TOPA does not

obligate an owner to provide an offer of sale to *former* tenants or their purported assignees. Rather, the overall scheme of the statute undercuts this interpretation since a purpose of the Sale Act is to strengthen the bargaining power of current tenants. *See id.* § 42-3401.02 (1). If a new tenant had lived in Banks's former unit at the time of sale, TOPA rights would vest only in that person — and not a sequence of former tenants and their assignees who might seek to outbid the current resident. *Cf. Morrison v. Branch Banking & Tr. Co. of Va.*, 25 A.3d 930, 937 (D.C. 2011) (holding that an owner need only entertain one offer from a unit with multiple occupants).

Papageorge nevertheless argues that ESB violated TOPA by not giving him an opportunity to make an offer before selling the Property to the Stuckeys. He claims that he notified ESB of his (purported) 2001 assignment from Banks (and its 2010 reaffirmation) on January 24, 2012, one day before the Bankses vacated the Property. However, no event at that time (or in 2001 or 2010) had triggered TOPA rights. TOPA requires the owner to notify tenants before he or she may "sell the accommodation," *see* D.C. Code § 42-3404.02 (a), or in other words, "[r]elinquish[] possession of the property," *see id.* § 42-3404.02 (b)(1). ESB had not sold or relinquished the Property at that time, nor had it contracted to do so. More than nine months would pass before ESB even entered into a listing

agreement with a real estate broker; it would be roughly ten months before the Stuckeys began negotiations with ESB.

Even if ESB formed an *intent* to sell the building while Banks was still a tenant, as Papageorge alleges, Papageorge cannot point to anything in TOPA that entitles a tenant or the tenant's purported assignee to receive notice as soon as an owner contemplates a sale. He instead notes this court's statement that "TOPA extends a panoply of rights to a residential tenant whose landlord *proposes* to sell the property or discontinue its use as rental housing." *1836 S St. Tenants Ass'n v. Estate of Battle*, 965 A.2d 832, 838 (D.C. 2009) (emphasis added). But this statement must be understood in context. The word "propose" means "to form or declare a plan or intention." *Webster's Third New International Dictionary* 1819 (2002). In *1836 S St.*, an estate declared its plan to sell by delivering an offer of sale to the building's tenants before receiving a third-party contract, thus triggering TOPA rights. *See* 965 A.2d at 835. In this case, by contrast, Papageorge has not demonstrated that ESB declared a plan to sell the Property (by making an offer of sale); he instead alleges that the bank merely thought about selling. Neither *1836 S St.* nor the text of TOPA requires an owner to begin the TOPA process at that stage.

This case is distinguishable from *Allman*, which held that a tenant's assignment of TOPA rights after receiving an owner's offer of sale remained valid even though she later vacated the unit. *See* 888 A.2d at 1169. By contrast, this court has never held that former tenants or their assignees have vested TOPA rights before the owner chooses to make, or is required to make, an offer of sale. Both *1836 S St.* and *Allman* considered only what duties a landlord owes to tenants who reside in the building at the time the owner makes an offer of sale. Although an assignee may take the place of a tenant after TOPA has been triggered, Papageorge never "became" a surrogate tenant of the Property because no event had triggered TOPA.

### III.  Conclusion

For the reasons stated, the judgment of the Superior Court is

*Affirmed.*